## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **JAMES LEWIS,** | **Civil Action No.: _____** |
| Plaintiff, | |
| v. | <u>**COMPLAINT**</u> |
| **SOULCYCLE LLC,** | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff James Lewis ("Plaintiff" or "Mr. Lewis"), by and through his attorneys, Hach Rose Schirripa & Cheverie, LLP, complaining of Defendant SoulCycle LLC ("Defendant," "SoulCycle" or the "Company"), brings this action for employment discrimination, hostile work environment, retaliation and constructive discharge pursuant to Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law, N.Y. Exec. L. §§ 296 *et seq.* ("NYSHRL") and the New York City Human Rights Law, N.Y. Admin. Code § 8-101 *et seq.* ("NYCHRL"). Upon information and belief, Plaintiff hereby alleges as follows:

### <u>JURISDICTION AND VENUE</u>

1.      This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because the claims asserted herein arise in part pursuant Section 1981.

2.      This Court has supplemental jurisdiction over Plaintiff's NYSHRL and NYCHRL claims pursuant to 28 U.S.C. § 1367, as they are related to the claims in this action within the Court's original jurisdiction such that they form part of the same case or controversy under Article III of the United States Constitution.

3.      Venue is proper in this Court under 28 U.S.C. § 1391 because Defendant resides in this judicial district and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

## PARTIES

4.      Plaintiff is a thirty-year-old African American male. He was employed by SoulCycle as an Instructor from around May 2015 until he was constructively discharged on or about October 22, 2022. Plaintiff currently resides in New York County, New York.

5.      Defendant SoulCycle is a Delaware limited liability company with its principal place of business located at 609 Greenwich Street, New York, New York 10014.

6.      SoulCycle offers indoor cycling and spinning workout classes in fitness studios mainly throughout the United States.

7.      At all relevant times, SoulCycle has met the definition of an "employer" of Plaintiff under all applicable statutes.

8.      SoulCycle is a subsidiary of Equinox Holdings, Inc. ("Equinox"), a Delaware corporation.

## FACTUAL ALLEGATIONS

### SoulCycle Instructor Levels

9.      There are essentially four levels of SoulCycle Instructors: New Instructor; Instructor (Level 1, Level 2 and Level 3), Senior Instructor and Master Instructor. New Instructor is the lowest level of Instructor, while Master Instructor is the highest level of Instructor achievable.

10.     SoulCycle's base pay rate structure is developed by geographic area, role and the number of classes taught per week.

11.    To this end, the amount of money an Instructor receives per class increases as his or her role increases. Thus, a New Instructor who teaches five classes per week earns considerably less than a Master Instructor who teaches ten classes per week.

12.    Other factors, such as the number of riders per class and periodic bonuses also factor into a SoulCycle Instructor's overall compensation.

13.    SoulCycle considers various factors in deciding promotions, the majority of which are subjective, but one such factor is measurable – utilization rate.

14.    Utilization rate is the percentage of spots (i.e., bikes) filled for any given class slot. For example, a class that has a capacity of 20 riders with 15 riders who attend has a utilization rate of 75%.

15.    As would be expected, a Senior or Master Instructor is expected to have a higher utilization rate than a Level III Instructor. It follows that a Level III instructor should have a higher utilization rate than a Level II Instructor, and so on.

16.    Upon information and belief, a Senior Instructor is expected to maintain an 80-90% utilization rate, whereas a Master Instructor is expected to maintain a 90% plus utilization rate.

17.    SoulCycle Instructors receive two performance evaluations per year, once in the spring and once in the fall.

18.    At each performance evaluation, Instructors are made aware of their individual performance metrics (i.e., utilization rates) and what metrics the Instructor needs to achieve for a promotion.

***Mr. Lewis Is Chosen for SoulCycle's Instructor Training Program***

19.    In January 2014, Mr. Lewis began working at the front desk of a SoulCycle studio located in Beverly Hills, California.

20.     After six months of working at the front desk at the Beverly Hills SoulCycle, Mr. Lewis was asked to audition and was chosen to train for SoulCycle's new batch of Instructors.

21.     After several rounds of interviews with the Training Officers from headquarters, and an audition, which he passed with flying colors, Mr. Lewis was informed that he was chosen to be in SoulCycle's "Group 16" Instructor Training Program (the "Training Program"), which would take place in New York City in October 2014.

22.     Upon being accepted into the Training Program, Mr. Lewis asked the head of the Training Program whether SoulCycle offered any type of financial assistance for its participants, including any aid for relocation and/or housing expenses, as Mr. Lewis was not being paid to participate in the program.

23.     Mr. Lewis was informed that SoulCycle did not offer financial assistance of any kind for participation in the Training Program.

24.     SoulCycle maintained that participation in the program was entirely "at will" and that it was each participant's "choice" as to whether he or she wanted to complete the training in hopes of becoming a SoulCycle Instructor.

25.     Based on the foregoing representation by SoulCycle, Mr. Lewis used his own funds to relocate from California to New York in order to participate in the Training Program.

26.     When in New York, Mr. Lewis asked some of the other participants how they could financially afford to be out of work while training, especially since Mr. Lewis was told that SoulCycle did not offer any monetary assistance to participants of the Training Program.

27.     Mr. Lewis learned that – contrary to SoulCycle's representation – a few of the participants, all of whom were white, had either received financial aid and/or housing assistance from SoulCycle.

28.    In fact, one of the Training Program participants, who is white, was allowed to keep his front desk job at SoulCycle while participating in the Training Program.

29.    Mr. Lewis, on the other hand, was told by SoulCycle that he was prohibited from working the front desk while training in New York.

30.    Again, SoulCycle did not provide or offer to provide Mr. Lewis, who is African American, with any form of financial assistance.

31.    The Training Program, which lasted approximately four to five weeks, culminated in Mr. Lewis presenting a showcase in New York City to determine if he was qualified.

32.    After the showcase, the head of the Training Program told Mr. Lewis that he was chosen to become a SoulCycle Instructor, that he was to return home to Los Angeles for his final community rides, and that he would then receive word from SoulCycle as to which SoulCycle studio he would be placed at in Los Angeles.

33.    In November 2014, Mr. Lewis completed his showcase and final community rides in Los Angeles, thus completing all of the necessary steps required to become a SoulCycle Instructor.

34.    Mr. Lewis was subsequently informed by the Training Officers that he had done everything correctly and that someone from SoulCycle would soon be in touch with him regarding a position in Los Angeles.

35.    Notably, SoulCycle's clients, who were students in Mr. Lewis's final showcase in Los Angeles gave him rave reviews and even asked the Training Officers when Mr. Lewis would be on the schedule as a New Instructor.

36.    Other potential SoulCycle Instructors also had their final showcases in Los Angeles on or around the same time that Mr. Lewis had his final showcase. These individuals, all of whom

are white, were given positions as SoulCycle Instructors in the Los Angeles area within a few days. Mr. Lewis, who is African American, was not.

37.    Mr. Lewis waited for nearly six months with no pay or communication from SoulCycle about his status as an Instructor.

38.    Meanwhile, approximately 20 of his fellow trainees, the majority of whom were white, all received their official titles as new SoulCycle Instructors and were placed in different fitness studios throughout the United States almost immediately.

39.    Even more surprising, some of Mr. Lewis's fellow trainees, all of whom were white, received placement at SoulCycle studios despite not physically riding the bike during the Training Program.

40.    After waiting patiently, in February 2015, Mr. Lewis contacted SoulCycle to inquire about his status, at which time he was told that he was "overlooked" and that in order to become an Instructor he would have to retrain in SoulCycle's "Los Angeles Training Group."

41.    Mr. Lewis was further informed that he would *only* be accepted into the Los Angeles Training Group if he agreed to relocate to a different geographical market because the Los Angeles market was too "saturated."

42.    Mr. Lewis agreed to SoulCycle's terms and participated in and completed the Los Angeles Training Group.

43.    Despite being told that the Los Angeles market was too "saturated," upon completing the training, Mr. Lewis learned that every other potential Instructor who participated in the Los Angeles Training Group (all of whom were white), were placed in the Los Angeles market.

44.    Mr. Lewis, who is African American, was placed in the Boston market.

*Mr. Lewis Develops the SoulCycle Market in Boston*

45.    In May 2015, Mr. Lewis relocated from Los Angeles to Boston. At this time, SoulCycle only had one studio in Boston, with five Instructors, including Mr. Lewis. He and the other instructors were there to "open the market." With Mr. Lewis's enthusiasm and commitment, they did.

46.    Throughout his time as a SoulCycle Instructor in Boston, Mr. Lewis's classes were either completely filled or near capacity. Mr. Lewis's performance evaluations during this time reflect that he was at a 90% plus utilization rate.

47.    Mr. Lewis's hard work proved advantageous for SoulCycle, as the Company was able to expand its Boston presence from one studio with five Instructors in 2015, to five studios with 12-14 Instructors by 2019.

48.    Although SoulCycle clearly benefited from Mr. Lewis's success, Mr. Lewis did not. During each performance evaluation for the next four years, Mr. Lewis was told by the SoulCycle talent manager assigned to the Boston market that SoulCycle was "happy" with his performance, but that he needed to "keep going" in order to be promoted from Instructor to Senior Instructor.

49.    Mr. Lewis was continuously denied advancement opportunities notwithstanding the fact that the metrics indicated that he was already performing at the Master Instructor level (i.e., over 90% utilization rate).

50.    Despite his tireless efforts, SoulCycle did not promote Mr. Lewis to Senior Instructor until July 2018.

51.     Meanwhile, Mr. Lewis's white counterparts, who were there for less time than he was, who did not open the Boston market, and who were who were not anywhere close to achieving the metrics that he was achieving, were being promoted to Senior Instructor at a much faster rate.

***Mr. Lewis Is Relocated to SoulCycle's Flagship Market***

52.     In June 2019, SoulCycle requested that Mr. Lewis relocate to SoulCycle's flagship market, New York City, where he would teach classes at the new Hudson Yards studio and would also "pilot" SoulCycle's At-Home Bike experience.

53.     SoulCycle's At-Home Bike experience allows individuals who purchase a SoulCycle At-Home Bike to take SoulCycle classes outside of the studio (i.e., at home) by utilizing a touch screen monitor to access pre-recorded (and now live) classes virtually through the Equinox+ app.

54.     SoulCycle was clear that Mr. Lewis's relocation would not come with a promotion or a pay raise. Nonetheless, Mr. Lewis obliged and moved to New York.

55.     Upon information and belief, SoulCycle would not have asked Mr. Lewis to relocate to New York City, open the Hudson Yards location and pilot the At-Home Bike experience, unless he was one of the top performing Instructors who could fill classes and achieve the same performance statistics in SoulCycle's flagship market.

56.     While in New York, Mr. Lewis learned that a Boston SoulCycle Instructor had been promoted from Senior Instructor to Master Instructor. Notably, this Instructor, who is white and who was hired *after* Mr. Lewis, had not achieved the same level of performance results as Mr. Lewis. Nonetheless, this Instructor received a significant promotion and pay rise in under five years, while Mr. Lewis, who was clearly one of the top performing Instructors at SoulCycle based

on numbers alone, was never awarded the distinction of Master Instructor throughout the entirety of his eight-year tenure with Company.

57.     Upon information and belief, SoulCycle Instructors across the United States (not only in Boston and New York City) who were not performing at or near the same levels as Mr. Lewis, the vast majority of whom are white, were being promoted much faster and were being promoted to positions above Mr. Lewis.

58.     SoulCycle's disparate treatment of Mr. Lewis is further evidenced by the fact that many other African American Instructors were forced to leave SoulCycle for this very reason.

59.     In fact, there is believed to be only about three African American Master Instructors at SoulCycle nationwide.

60.     In March 2020, the COVID-19 pandemic forced SoulCycle to lay off almost all of the Company's Instructors. Approximately 300 Instructors were laid off at the time, yet Mr. Lewis and about six other Instructors remained actively employed.

61.     Upon information and belief, Mr. Lewis would not have remained employed during this tumultuous time had he not been one of SoulCycle's top performing Instructors.

62.     Notably, every single one of the other SoulCycle Instructors who remained employed with SoulCycle at this time was a Master Instructor, and every single one of them was white.

63.     Meanwhile, SoulCycle had continuously failed to promote Mr. Lewis, who is African American, to Master Instructor.

64.     Throughout the COVID-19 pandemic, Mr. Lewis continued to teach SoulCycle classes at SoulCycle's Hudson Yards studio, which was located outside under a tent.

65.     Mr. Lewis also filmed videos for SoulCycle's At-Home Bike experience throughout the COVID-19 pandemic.

66.     As previously stated, SoulCycle is owned by Equinox. Equinox also owns the digital platform used for SoulCycle's At-Home Bike, the Equinox+ app.

67.     Because of Equinox's ownership of the Equinox+ app, Mr. Lewis received a separate performance review from Equinox+ in June 2020.

68.     During his June 2020 performance review with Equinox+, Mr. Lewis's was informed that his pre-recorded videos for SoulCycle At-Home Bike powered by Equinox+ were the most watched on the platform.

69.     During his June 2020 performance review with Equinox+, Mr. Lewis asked if his stellar performance (both at the studio and via the app) warranted him a pay raise. He was told no. Mr. Lewis then asked if SoulCycle was at least considering promoting him. He was told that it was being discussed, but no further details were provided.

70.     Notwithstanding the fact that Mr. Lewis was the only Senior Instructor kept on during the COVID-19 pandemic, that his workload increased as a result, that he was forced to work in potentially hazardous conditions, and that his videos were the most watched on the SoulCycle At-Home Bike/Equinox+ platform, Mr. Lewis did not receive a promotion either at this time or anytime thereafter.

71.     SoulCycle started reopening studios in early to mid-2021, as COVID restrictions were being lifted in New York City. Concurrently, SoulCycle began hiring back the Instructors that it had previously laid off.

72.     To Mr. Lewis's surprise, some of these Instructors that SoulCycle hired back immediately received promotions to Master Instructor once they were re-hired. Notable, all of these Instructors who received promotions to Master Instructor were white.

73.     SoulCycle's decision to promote the previously laid off white Instructors to Master Instructor made it abundantly clear to Mr. Lewis that his race was the deciding factor in SoulCycle's decision not to promote him to Master Instructor.

74.     Mr. Lewis also realized that his race was also the reason that it took *more than three years* for SoulCycle to promote Mr. Lewis to Senior Instructor despite being one of the Company's top performers who played a vital role in opening and establishing the Boston market.

### Mr. Lewis Is Retaliated Against for Spotlighting Racial Discrimination and Subjected to a Hostile Work Environment

75.     Frustrated with his lack of advancement opportunities and constantly being treated less favorable than other Instructors because of his race, in or around April 2021, Mr. Lewis put in his two-week notice.

76.     Before Mr. Lewis's resignation was finalized, Mr. Lewis was contacted by SoulCycle's Chief Executive Officer ("CEO").

77.     During his conversation with the CEO in or around April 2021, the CEO convinced Mr. Lewis to stay at SoulCycle by offering him $15 more per class and by promising him that he would be promoted to Master Instructor during his next performance evaluation in the fall of 2021.

78.     On or around this time, Mr. Lewis voiced his concerns to SoulCycle's CEO that he was not being treated equal to his white counterparts in the terms and conditions of his employment due to his race.

79.     Rather than address his concerns, SoulCycle retaliated against Mr. Lewis pulling him from SoulCycle's At-Home Bike experience, which significantly reduced his total income and which negatively impacted his online media presence and thus his overall earning capacity.

80.      Further, Mr. Lewis was instructed that he could not express to anyone, especially his clients, the real reason that he was being removed from SoulCycle's At-Home Bike platform – a platform that he helped to both pilot and cultivate.

81.     Notwithstanding the Company's acknowledgement of Mr. Lewis's success and the CEO's past promise of a promotion, Mr. Lewis was not promoted to Master Instructor during his fall 2021 performance evaluation.

82.     Nor was Mr. Lewis promoted to Master Instructor during his spring 2022 performance evaluation. Instead, Mr. Lewis was given a raise of $0.75 more per rider and was once again told that he was one of the Company's top performers.

83.     The incremental raise, however, was meaningless because *after* Mr. Lewis raised his concerns of racial discrimination, SoulCycle changed Mr. Lewis's schedule such that he was given the least desirable timeslot with the lowest number of riders, thereby reducing his overall compensation.

84.     Despite the fact that Mr. Lewis had to jump through hoops to even became a SoulCycle Instructor (whereas his white counterparts did not), was critical in opening and expanding SoulCycle's Boston market, was critical in opening the Hudson Yards SoulCycle studio, maintained over a 90% plus utilization rate even in SoulCycle's flagship market (most of his metrics were in the 103% range consecutively for 5+ years), and helped to pilot and grow SoulCycle's At-Home Bike platform (where his videos were among the most watched), SoulCycle

continuously and willfully discriminated against Mr. Lewis on the basis of his race and even retaliated against him once he raised these concerns.

85.    Mr. Lewis witnessed his white counterparts receive promotions and additional support from SoulCycle during the same time period that SoulCycle failed to promote or recognize him. SoulCycle curated social media campaigns and promotions that celebrated and endorsed its white Instructors, while failing to recognize and/or include Mr. Lewis.

86.    Mr. Lewis's exclusion from SoulCycle campaigns was so apparent that participants of his classes began to questions him as to why he was never featured.

87.    As a result of the foregoing, the atmosphere at SoulCycle had become so intolerable. In fact, Mr. Lewis became so discouraged, distraught and unmotivated to continue working at SoulCycle due to hostile work environment and the years of unfair treatment that he was subjected to, that on or about October 22, 2022, Mr. Lewis was constructively discharged from his position at SoulCycle.

## FIRST CAUSE OF ACTION
### DISCRIMINATION IN VIOLATION OF SECTION 1981

88.    Plaintiff repeats and incorporates by reference the allegations stated above as if they were set forth in full herein.

89.    Defendant discriminated against Plaintiff in violation of Section 1981 by failing to promote Plaintiff on the basis of his race and thus denying him equal terms and conditions of employment.

90.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which he is entitled an award of monetary damages and other relief.

91.     As a direct and proximate result of the unlawful conduct committed by Defendant in violation of Section 1981, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

92.     Defendant's unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under Section 1981, for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
## RETALIATION IN VIOLATION OF SECTION 1981

93.     Plaintiff repeats and incorporates by reference the allegations stated above as if they were set forth in full herein.

94.     By and through its course of conduct, Defendant retaliated against Plaintiff in violation of Section 1981 for complaining about unequal treatment on the basis of race by altering the terms and conditions of his employment. Specifically, after Plaintiff raised his concerns of unequal treatment on the basis of his race, Defendant altered the terms and conditions of his employment by giving Plaintiff a less favorable schedule and by pulling Plaintiff from SoulCycle's At Home Bike program, which significantly reduced Plaintiff's total income and which negatively impacted his online media presence and thus his overall earning capacity.

95.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which he is entitled an award of monetary damages and other relief.

14

96.     As a direct and proximate result of the unlawful conduct committed by Defendant in violation of Section 1981, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

97.     Defendant's unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under Section 1981, for which Plaintiff is entitled to an award of punitive damages.

**THIRD CAUSE OF ACTION**
**HOSTILE WORK ENVIRONMENT IN VIOLATION OF SECTION 1981**

98.     Plaintiff repeats and incorporates by reference the allegations stated above as if they were set forth in full herein.

99.     In the course of performing the duties of his position, Plaintiff was forced to endure a hostile work environment, which was severe and pervasive and which altered his working conditions. Defendant's established and tolerated this hostile work environment on the basis of Plaintiff's race.

100.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which he is entitled an award of monetary damages and other relief.

101.    As a direct and proximate result of the unlawful conduct committed by Defendant in violation of Section 1981, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and

anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

102.    Defendant's unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under Section 1981, for which Plaintiff is entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**CONSTRUCTIVE DISCHARGE IN VIOLATION OF SECTION 1981**

103.    Plaintiff repeats and incorporates by reference the allegations stated above as if they were set forth in full herein.

104.    Plaintiff's work environment had become so objectively and subjectively intolerable that Plaintiff felt compelled to resign from SoulCycle, as any reasonable person in his position would have done. As a result, Plaintiff was constructively discharged from his position in violation of Section 1981.

105.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which he is entitled an award of monetary damages and other relief.

106.    As a direct and proximate result of the unlawful conduct committed by Defendant in violation of Section 1981, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

107.    Defendant's unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless

as to amount to such disregard of Plaintiff's protected rights under Section 1981, for which Plaintiff is entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION
## DISCRIMINATION IN VIOLATION OF NYSHRL

108.    Plaintiff repeats and incorporates by reference the allegations stated above as if they were set forth in full herein.

109.    By and through its course of conduct, Defendant willfully violated the NYSHRL by *inter alia*, failing to promote Plaintiff on the basis of his race.

110.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which he is entitled an award of monetary damages and other relief.

111.    As a direct and proximate result of the unlawful conduct committed by Defendant in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

112.    Defendant's unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
## RETALIATION  IN VIOLATION OF NYSHRL

113.    Plaintiff repeats and incorporates by reference the allegations stated above as if they were set forth in full herein.

114.    By and through its course of conduct, Defendant retaliated against Plaintiff in violation of the NYSHRL for complaining about unequal treatment on the basis of race. Specifically, after Plaintiff raised his concerns of unequal treatment on the basis of his race, Defendant altered the terms and conditions of his employment by giving Plaintiff a less favorable schedule and by pulling Plaintiff from SoulCycle's At Home Bike program, which significantly reduced Plaintiff's total income and which negatively impacted his online media presence and thus his overall earning capacity.

115.    As a direct and proximate result of the unlawful retaliatory conduct committed by Defendant in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which he is entitled to an award of monetary damages and other relief.

116.    As a direct and proximate result of the unlawful retaliatory conduct committed by Defendant in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

117.    Defendant's unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

**SEVENTH CAUSE OF ACTION**
**HOSTILE WORK ENVIRONMENT  IN VIOLATION OF NYSHRL**

118.    Plaintiff repeats and incorporates by reference the allegations stated above as if they were set forth in full herein.

119.    In the course of performing the duties of his position, Plaintiff was forced to endure a hostile work environment such that Defendant subjected Plaintiff to inferior terms, conditions or privileges of employment on the basis of his race.

120.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which he is entitled an award of monetary damages and other relief.

121.    As a direct and proximate result of Defendant's unlawful conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

122.    Defendant's unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
## CONSTRUCTIVE DISCHARGE  IN VIOLATION OF NYSHRL

123.    Plaintiff repeats and incorporates by reference the allegations stated above as if they were set forth in full herein.

112.    Plaintiff's work environment had become so objectively and subjectively intolerable that Plaintiff felt compelled to resign from SoulCycle, as any reasonable person in his position would have done. As a result, Plaintiff was constructively discharged from his position in violation of the NYSHRL.

124.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which he is entitled an award of monetary damages and other relief.

125.    As a direct and proximate result of Defendant's unlawful conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

126.    Defendant's unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

**NINTH CAUSE OF ACTION**
**DISCRIMINATION  IN VIOLATION OF NYCHRL**

127.    Plaintiff repeats and incorporates by reference the allegations stated above as if they were set forth in full herein.

128.    By and through its course of conduct, Defendant willfully violated the NYCHRL by *inter alia*, failing to promote Plaintiff on the basis of his race.

129.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which he is entitled an award of monetary damages and other relief.

130.    As a direct and proximate result of Defendant's unlawful conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-

esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

131.    Defendant's unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**TENTH CAUSE OF ACTION**
**RETALIATION  IN VIOLATION OF NYCHRL**

132.    Plaintiff repeats and incorporates by reference the allegations stated above as if they were set forth in full herein.

133.    By and through its course of conduct, Defendant retaliated against Plaintiff in violation of the NYCHRL for complaining about unequal treatment on the basis of race. Specifically, after Plaintiff raised his concerns of unequal treatment on the basis of his race, Defendant altered the terms and conditions of his employment by giving Plaintiff a less favorable schedule and by pulling Plaintiff from SoulCycle's At Home Bike program, which significantly reduced Plaintiff's total income and which negatively impacted his online media presence and thus his overall earning capacity.

134.    As a direct and proximate result of the unlawful retaliatory conduct committed by Defendant in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which he is entitled to an award of monetary damages and other relief.

135.    As a direct and proximate result of the unlawful retaliatory conduct committed by Defendant in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment,

stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

136.    Defendant's unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**ELEVENTH CAUSE OF ACTION**
**<u>HOSTILE WORK ENVIRONMENT IN VIOLATION OF NYCHRL</u>**

137.    Plaintiff repeats and incorporates by reference the allegations stated above as if they were set forth in full herein.

138.    In the course of performing the duties of his position, Plaintiff was forced to endure a hostile work environment such that Defendant treated Plaintiff less favorably than others on the basis of his race.

139.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which he is entitled an award of monetary damages and other relief.

140.    As a direct and proximate result of Defendant's unlawful conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

141.    Defendant's unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless

22

as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## TWELFTH CAUSE OF ACTION
## CONSTRUCTIVE DISCHARGE IN VIOLATION OF NYCHRL

113.    Plaintiff repeats and incorporates by reference the allegations stated above as if they were set forth in full herein.

114.    Plaintiff's work environment had become so objectively and subjectively intolerable that Plaintiff felt compelled to resign from SoulCycle, as any reasonable person in his position would have done. As a result, Plaintiff was constructively discharged from his position in violation of the NYCHRL.

142.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which he is entitled an award of monetary damages and other relief.

143.    As a direct and proximate result of Defendant's unlawful conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

144.    Defendant's unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this court grant the following relief:

A. declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States and the State and City of New York;

B. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

C. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for his mental anguish and emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical and mental injuries;

D. An award of punitive damages;

E. An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

F. Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all of the triable issues of fact and damages stated herein.

Dated: New York, New York
   April 24, 2023

Respectfully submitted,

**HACH ROSE SCHIRRIPA & CHEVERIE LLP**

By:    */s/ Kathryn A. Hettler*
   Kathryn A. Hettler
   112 Madison Avenue, 10th Floor
   New York, New York 10016
   Telephone: (212) 213-8311
   Facsimile: (212) 779-0028

   *Counsel for Plaintiff*